UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KEVIN MADISON,

               Plaintiff,

      v.                                       Case # 19-CV-6554 FPG
                                              DECISION AND ORDER

SUPERINTENDENT CROWLEY,
LIEUTENANT OLLES, SERGEANT
ADINO, PRISON GUARD J. DIXON,
PRISON GUARD M. CAVALLERO ,

               Defendants.

_____

       *Pro se* Plaintiff Kevin Madison, a state prisoner presently housed at the Orleans Correctional Facility, has filed an Amended Complaint ((Docket ("Dkt.") No. 13) and, with the Court's permission (Dkt. No. 16), a Supplemental Complaint (Dkt. No. 17) under 42 U.S.C. § 1983.  He alleges claims against Superintendent Crowley, Lieutenant Olles, Sergeant Adino, Prison Guard J. Dixon and Prison Guard M. Cavallero.  He also has submitted an application to proceed *in forma pauperis* (Dkt. No. 8)[1] and a motion to appoint counsel (Dkt. No. 12).

## **DISCUSSION**

       Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed the required authorization (Dkt. No. 8), he is granted permission to proceed *in forma pauperis*. Therefore, under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), this Court must screen the Amended and Supplemental Complaints.

---

[1] Madison filed two applications to proceed *in forma pauperis*.  (Dkt. Nos. 6, 8).  His first application (Dkt. No. 6) failed to include a signed authorization and is therefore, denied as moot.

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The Court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the Court determines that the action (1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915A(b)(1)-(2).  Generally, the Court will afford a pro se plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."  *Abbas*, 480 F.3d at 639 (internal quotation marks omitted).  But leave to amend pleadings may be denied when any amendment would be futile.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## I.      Factual Allegations[2]

### A.   Amended Complaint

Plaintiff states that from May 15, through May 17, 2019, he was placed in SHU under a 72-hour investigation and was deprived of his due process rights.  He filed a grievance challenging his unreasonable SHU confinement and gave Crowley "written notice" that he feared retaliation and needed safeguards.  (Dkt. No. 13 at 3.)  Plaintiff was subjected to retaliatory hazing by Dixon including unreasonable search and seizure, where his living quarters would be searched and he would not be given a "searched receipt," contrary to DOCCS directives.  He was harassed, restricted

---

[2] These facts are derived from the "Statement of Fact" section of the Amended Complaint.  However, Plaintiff frequently sets forth additional facts in the section of the Amended Complaint where he addresses his constitutional claims.  To the extent they are helpful, these additional facts are recited below in the Court's discussion of the relevant claim.  The Court does not incorporate them here as it is not clear where they fit in the chronology of events.

to the top bunk, his cube was vandalized, he was subjected to racial slurs, and comments about his hair.  (*Id.*)  Crowley failed to act to safeguard Plaintiff from retaliation by her staff.  (*Id.*)

On July 8, 2019, Dixon "haze[d]" Plaintiff by yelling at him, insulting him and harassing him about his hair.  (*Id.* at 4-5.)  After arriving at his cube at the conclusion of programs, Plaintiff found that his living quarters were "vandalized."  (*Id.*)  Dixon destroyed his clippers, emptied his food onto the floor, ripped his photos, threw his clothes up and down the dormitory aisle and walked on them, read Plaintiff's legal documents which had been removed from a manila envelope, and were thrown all over the floor, and violated Directive No. 4910 which requires correctional officers to avoid damage or destruction to property when conducting searches .  (*Id.* at 5, 7.)  Dixon questioned Plaintiff about a radio with the wrong DIN number that was on Plaintiff's bed.  (*Id.*)  Plaintiff told Dixon that the radio was his and showed Dixon an I-64 Property Inventory Form that established his ownership.  (*Id.*)  Dixon asked Plaintiff, "So what are you going to do?  File a grievance?"  (*Id.*)  Dixon paced inside of Plaintiff's cube as Plaintiff put his belongings away.  (*Id.* at 6.)  When other prisoners tried to help, Dixon "harassed" them.  (*Id.*)  When Plaintiff invoked his right to remain silent, Dixon falsified the "Cell Frisk Sheet" writing that he found a radio with no DIN number and an alpha sheet, and then threatened Plaintiff that he'd go to "the box" if he did not answer Dixon.

On July 9, 2019, Plaintiff was retaliated against for invoking his right to remain silent. Dixon wrote a false misbehavior report stating that Plaintiff was smoking in the bathroom.  Dixon's false misbehavior report violated DOCCS employee rulebook—§ 3.4, Falsification of Records. Crowley allowed Dixon to falsify misbehavior reports even though doing so violated Directive No. 4932, which states that falsifying misbehavior reports as retaliation is prohibited.  (*Id.* at 7.)

On July 11, 2019, Plaintiff was sent for a hearing regarding Dixon's false misbehavior report for smoking in the bathroom.  (*Id.* at 8.)  Olles, who was conducting the hearing, asked Plaintiff if he had any witnesses.  Plaintiff told Olles he had eight witnesses to which Olles responded, "Dude are you f\*\*king kidding me?  It's only a Tier II smoking ticket, just take the ticket."  (*Id.* at 8 (emphasis omitted).)   Before he began recording the hearing Olles refused to call Plaintiff's witnesses finding them irrelevant.  (*Id.*)  After the recording started Plaintiff said on the record that Olles was biased and seeking to suppress his evidence.  (*Id.*  at 8-9.)  Olles turned off the recording and adjourned the hearing, sending Plaintiff back to his dormitory.  (*Id.* at 9.)

On July 12, 2019, Cavallero began to harass Plaintiff regarding his hair and grievance filing. (*Id.*)  He questioned Plaintiff regarding a lawsuit against Dixon that he found during a search of Plaintiff's living quarters.  (*Id.*)  Cavallero directed Plaintiff to show him the lawsuit.  (*Id.*)  Plaintiff refused.  (*Id.*)  Later that day while Plaintiff was teaching a "business dynamics" course, he learned from other prisoners that Cavallero asked Adino for permission to search his living quarters, which she gave to Cavallero.  (*Id.* at 10.)  Plaintiff stopped teaching and, while walking back to his cube, stopped to file a grievance.  When he got to his cube, Cavallero became very aggressive and told Plaintiff to "either give him [the] requested [legal] documents or he is going to trash [Plaintiff's] cube looking for [them]."  (*Id.* at 10.)  Plaintiff responded that the sun went down, and it was currently the Sabbath, and asked to be left alone.  (*Id.*)  Cavallero started laughing and calling Plaintiff a "Black Jew."  (*Id.*)  Plaintiff responded that it is a "shame" to be subjected to these "petty indignities" when he is trying to rehabilitate himself and prepare for reentry into society.  (*Id.* at 10-11.)  Cavallero started yelling and demanding to see Plaintiff's legal documents.  (*Id.* at 11.) Cavallero directed Plaintiff to "unlock your sh\*t," which he did, and Cavallero went straight to the manila envelope containing Plaintiff's legal work and began to slowly read Plaintiff's legal

documents.  (*Id.*)  Cavallero threw Plaintiff's legal work into the garbage, which he locked "in phone booth number 2," then gave Plaintiff a falsified search slip.  (*Id.*)

On July 13, 2019, Plaintiff was interviewed by a female Sergeant regarding the grievance he filed on July 12, 2019 against Cavallero.  (*Id.* at 11.)  She said that she would talk to Cavallero and Dixon.  (*Id.*)

On July 16, 2019, Plaintiff was called to the disciplinary office to finish the hearing on Dixon's falsified misbehavior report claiming that Plaintiff was smoking in the bathroom.  (*Id.*)  Plaintiff pleaded not guilty and stated on the record that the charges were false and intended as retaliation against Plaintiff for his grievance writing.  (*Id.* at 12.)  Plaintiff attempted to call his eight witnesses and attempted to read their statements into the record.  (*Id.*)  Olles took the statements, keeping Plaintiff from reading them all into the record, and would not give them back even after Plaintiff told Olles that they were needed as exhibits for the Court.  (*Id.*)  Olles only called two of Plaintiff's eight witnesses.  Olles eventually stopped taping the hearing and tried to get Plaintiff to plead guilty, but Plaintiff refused.  (*Id.*)  Olles later falsified the "Statement of Evidence Relied Upon," writing that Plaintiff admitted to not following orders.  (*Id.*)  Olles refused to give Plaintiff the hearing tape number.  (*Id.*)  Olles found Plaintiff guilty and sanctioned him with thirty days under keeplock in SHU, which Plaintiff appealed.  (*Id*. at 12-13.)

On July 29, 2019, Plaintiff was handcuffed and removed from his SHU cell and placed in a holding pen.  (*Id.* at 13.)  Sergeant Patti and other correctional officers ransacked his cell, read his legal documents and confiscated the § 1983 "petition" he was drafting for this action.  (*Id.*)

On August 6, 2019, Plaintiff was released from SHU and placed back in a housing unit in which Dixon and Cavallero worked even though there was other space available.  (*Id.*)  Immediately after his shift began, Cavallero started harassing Plaintiff.  Plaintiff stayed in his cube hoping to

avoid Cavallero, but Cavallero came into Plaintiff's cube and "got into his face," telling him that there was no need for him to unpack because he was "just going to box him anyway." (*Id.* at 14.) Cavallero harassed Plaintiff about his hair and spitefully took Plaintiff's identification card "just to make [him] pay [t]wo U.S. Dollars for a new one," which he did on August 7, 2019. (*Id.*)

On August 8, 2019, Dixon tried to prevent Plaintiff from getting a food package, but when Plaintiff demanded to speak to a Sergeant, Dixon allowed Plaintiff to go get his package. (*Id.*) Plaintiff told Dixon that he did not have an identification card, which Dixon knew because Dixon and Cavallero are "coordinating the harassment tactics." (*Id.*) Plaintiff went to get his package. (*Id.*) When he returned, Dixon told Plaintiff that he was issuing a misbehavior report for not signing out to go to the package room. Dixon "contorted his fingers into a gun symbol and pretended to shoot [Plaintiff]," who went back to his cube to avoid further exchanges with Dixon. (*Id.*)

On August 12, 2019, Dixon issued Plaintiff a misbehavior report for movement violations, unreported identification card and not having an identification card. (*Id.*) Dixon falsified the misbehavior report writing that Plaintiff said he did not apply for a new identification card, which was false because Plaintiff had evidence that he had applied for a new identification card several days before. (*Id.* at 14; Dkt. No. 13 at 67.)

On August 13, 2019, while Plaintiff was preparing a meal in the facility microwave, Dixon came into the day room and demanded to search him. (*Id.* at 15.) Dixon threatened to "box" Plaintiff and told him that "if he continued to play the 'grievance game' he was going to find a can lid in his locker." (*Id.*)

The next morning, Plaintiff was sent to the disciplinary office for a hearing on the misbehavior report Dixon wrote for movement and identification card violations. (*Id.*) At the hearing Plaintiff argued that he did not sign out because Dixon had directed him to go to the package

room.  (*Id.* at 15.)  Plaintiff stated that, Dixon lied in the misbehavior report by writing that Plaintiff told Dixon that he did not apply for a new identification card because Plaintiff had applied and "displayed" before the hearing officer the identification card application he submitted before Dixon's misbehavior report was written.  (*Id.*)  Plaintiff was found guilty of the movement violation but not guilty of the identification card violations.  (*Id.*)  He was sanctioned with thirty days loss of recreation and phone privileges.  (*Id.*)

B.  Supplemental Complaint

In the Supplemental Complaint, Plaintiff alleges that on October 31, 2019, despite prior complaints and grievances, he was put back on to Cavallero's housing unit although vacancies existed in other housing units.  (Dkt. No. 17 at 2.)  Plaintiff spoke to a Lieutenant about moving "him out of harm's way" and the Lieutenant, who was aware of the issues between Plaintiff and Cavallero informed Plaintiff that he would be moved the next day.  (*Id.*)  Plaintiff "insisted" that he be moved immediately before Cavallero's shift started because he feared for his safety.  (*Id.* at 2-3.)  The Lieutenant told Plaintiff that he would see what he could do, but Plaintiff was never moved. (*Id.* at 3.)

Cavallero started his shift at 3:00 p.m. and immediately started harassing Plaintiff about a grievance Plaintiff filed against Cavallero on October 17, 2019.  (*Id.* at 3.)  Cavallero attempted to intimidate and threaten Plaintiff.  (*Id.*)  Cavallero snatched papers out of Plaintiff's hands, which were letters to Plaintiff's family, and reviewed them to determine if they were grievances against him.  (*Id.*)  "This continued his whole shift."  (*Id.*)

On November 1, 2019, Plaintiff filed a grievance against Cavallero.  (*Id.*)  Cavallero did not work on November 1 or 2, 2019, but on November 3, 2019, he made "unwanted aggressive physical contact [with Plaintiff] while yelling at [Plaintiff] about [the] grievance filed against him on

November 1, 2019." (*Id.*)  Cavallero directed Plaintiff to "'get the fuck' on the wall with his palms flat, while aggressively searching him and threatening him with brutal violence if [Plaintiff] continue[d] to grieve him." (*Id.* at 4.)  "These arbitrary exchanges continued for hours." (*Id.*) Plaintiff lay under his covers to try to avoid Cavallero, but Cavallero would come into Plaintiff's cube and pull the covers off him "while the whole unit watched." (*Id.*)

Cavallero directed Plaintiff to go to the laundry room "seeking a fist fight." (*Id.*)  After Plaintiff ignored him and refused to leave his bed, Cavallero told him a second time to go to the laundry room. (*Id.*)  Plaintiff was escorted to the laundry room by Cavallero who got "within inches of his face" questioning him about grievances. (*Id.*)  Plaintiff invoked his right to remain silent, which enraged Cavallero who began choking him with an open hand, then grabbed Plaintiff's face and banged the back of his head on the wall. (*Id.*)  To cover for his behavior, Cavallero called the emergency response team. (*Id.*)  Less than two minutes later several correctional officers rushed into the laundry room along with Adino. (*Id.*)  Plaintiff's arms were "forcefully pulled and snatched to the back and he was placed in mechanical restraints." (*Id.*)  When other prisoners saw Plaintiff exit the laundry room in handcuffs the other prisoners "began jumping up and down furiously" telling Adino that Cavallero is "dirty" and "crooked". (*Id.*)  Several prisoners informed Adino that Cavallero ordered Plaintiff out of his bed into the laundry room, then closed the doors and called the response team to seize Plaintiff. (*Id.*)  The prisoners told Adino that Plaintiff "did nothing wrong."  They also complained that Adino is "letting [Cavallero] do this and get away with it." (*Id.*)  Despite these protests, Plaintiff was escorted to SHU, strip searched and placed in solitary confinement.

Once in SHU, Plaintiff began petitioning the DOCCS Commissioner and Orleans Superintendent "demanding [that] he be released from such unconstitutional confinement immediately." (*Id.* at 5.)

On November 4, 2019, Plaintiff was served an "intentional and malicious retaliatory [m]isbehavior report written by Cavallero." (*Id.*)  A hearing was held on Cavallero's false misbehavior report from November 9 to 11, 2019.  Plaintiff pleaded not guilty to all charges.  (*Id.*)  Plaintiff called six witnesses who testified "condemning" what Cavallero had done and explaining that Cavallero "continually harassed" Plaintiff.  (*Id.*)  They also testified that Cavallero ordered Plaintiff out of bed, escorted him to the laundry room and then called for the emergency response team. (*Id.*)  On November 11, 2019, Plaintiff was found not guilty on all charges and was removed from SHU.  (*Id.*)

## II.    Standard of Review

In evaluating the Complaint, the Court must accept all factual allegations as true and must draw all inferences in the plaintiff's favor.  *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999).  "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93, (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted); *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir 2008) (discussing pleading standard in pro se cases after *Twombly*: "even after *Twombly*, dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases.").  Although "a court is obliged to construe [pro se] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted pro se must meet the notice

requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir.1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### III.   Analysis

#### A. Retaliation

##### 1.   Plaintiff's Grievance Writing

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Colon v. Coughlin*, 58 F.3d 865, 872 (S.D.N.Y. 2016). To establish a First Amendment retaliation claim, Plaintiff must show (1) that he engaged in constitutionally protected speech or conduct, (2) that the defendants took adverse action against him, and (3) that there was a causal connection between the protected activity and the adverse action. *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon*, 58 F.3d at 872-73. A complaint of retaliation that is "wholly conclusory" can be dismissed

on the pleadings alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Only those retaliatory acts that are likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment are actionable under § 1983; in other words, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (cited with approval in *Dawes*, 239 F.3d at 492. *See Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (on remand, district court to consider the "serious question" of "whether the alleged acts of retaliation . . . were more than de minimis" in deciding summary judgment motion). A *de minimis* retaliatory act is outside the ambit of constitutional protection. *Dawes*, 239 F.3d at 492. "This objective inquiry is 'not static across contexts,' but rather must be 'tailored to the different circumstances in which retaliation claims arise.'" *Id*. (quoting *Thaddeus-X*, 175 F.3d at 398). "'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.'" *Id*.

Plaintiff alleges that virtually every action giving rise to his claims was motivated, at least in part, by Defendants' desire for retaliation. With regard to the lion's share of his Amended and Supplemental Complaints, he has not, however, shown that the adverse actions of which he complains were causally connected to that activity.

### a.  Crowley

Plaintiff alleges that although he gave Crowley written notice that he feared retaliation and needed safeguards, Crowley failed to implement any pre-deprivation safeguards to protect him from retaliation.

These allegations are insufficient to satisfy any of the requirements necessary to state a retaliation claim against Crowley. Plaintiff's retaliation claim against Crowley must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

b. <u>Dixon</u>

Plaintiff alleges that Dixon retaliated against him by harassing him, "weaponizing" the DOCCS disciplinary program, "vandalizing" his living quarters and property and repeatedly threatening and intimidating him. (Dkt. No. 13 at 16.) Plaintiff does not, however, connect his grievance writing to any of Dixon's conduct. It is insufficient for Plaintiff to claim that his grievance writing motivated Dixon's actions without connecting his grievance writing to the complained of activity and setting forth facts to, at least, suggest that his grievance writing was causally connected to Dixon's actions. All he has shown is that at times he had problems with or complaints about Dixon's behavior. Simply adding an allegation that Dixon acted out of retaliatory motives is easy to do, but it is not enough. It is, in fact, because of the "ease with which a retaliation claim may be fabricated," *Nunez v. Goord*, 172 F. Supp. 2d 417, 431 (S.D.N.Y. 2001), that courts "approach prisoner claims of retaliation 'with skepticism and particular care." *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 339 (W.D.N.Y. 2008) (quoting *Dawes*, 239 F.3d at 491); *see also Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) ("Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act'") (quoting *Dawes*, 239 F.3d at 491). This claim must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

c. Cavallero

Plaintiff alleges that Cavallero retaliated against him on July 12, 2019, when he was aggressive toward Plaintiff, searched his cell for legal documents although it was the Jewish Sabbath, threw Plaintiff's legal work in the garbage and then locked away the garbage. (Dkt. 13 at 9-11.)[3]   In his Supplemental Complaint, Plaintiff alleges that on November 3, 2019, almost immediately after he filed a grievance against Cavallero for harassing him about his grievance filing, Cavallero was physically aggressive toward him while yelling at him about the grievance he filed.

With respect to Plaintiff's claim regarding the July 12, 2019, search incident, settled authority establishes that the search of an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation.  *See Hudson v. Palmer*, 468 U.S. 517, 527 (1984); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007) ("[i]t is well settled . . . that plaintiff cannot base a retaliation claim . . . based on a cell search"); *Salahuddin v. Mead*, No. 95 Civ. 8581(MBM), 2002 WL 1968329, *5 (S.D.N.Y. 2002) ("a retaliatory cell search is insufficient to support a First Amendment retaliation claim") (collecting cases).  However, with respect to the November 3, 2019, incident, Plaintiff's allegations are sufficient to causally connect his grievance writing to Cavallero's conduct.  This claim is sufficient for service on Cavallero.

2. Plaintiff's Silence

Plaintiff alleges that Dixon retaliated against him for invoking his right to remain silent.

The right to remain silent is among the procedural safeguards the Supreme Court created in its landmark decision *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  *Miranda* warnings are

---

[3] Although Plaintiff alleges that he filed a grievance because of Cavallaro's search, that grievance was filed before Plaintiff met Cavallero at his cube, after which Cavallero conducted the search.  There are no facts to suggest that Cavallero knew about Plaintiff's grievance filing.

intended to help effectuate the Fifth Amendment's directive that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. 5. To prevent a Fifth Amendment violation, a person must be given the *Miranda* warning whenever that person is involved in a custodial interrogation. *See United States v. Carr*, 63 F. Supp. 3d 226, 2-35 (E.D.N.Y. 2014) (quoting *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (recognizing that "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda's* prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'")); *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (quoting *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) ("*Miranda's* warning requirements, however, apply only to 'custodial interrogation.'" )).[4]

The facts alleged in Plaintiff's Amended Complaint or Supplemental Complaint demonstrate that he was not under custodial interrogation and thus was not in a position to invoke his right to remain silent such that Dixon's conduct could be considered retaliation. This claim must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

### B. Free Exercise of Religion

Plaintiff alleges that Dixon, Cavarello and Adino violated his right to freely exercise his religion. Dixon failed to follow DOCCS Directive 4910 "to take [p]recaution while searching religious material." (Dkt. No. 13 at 17.) During a search of Plaintiff's cell, Dixon threw Plaintiff's torah on the floor "like a piece of garbage." (*Id.*) Cavallero engaged in a "degrading" search of Plaintiff's living quarters which caused Plaintiff to have to break strict sabbath rules in order to

---

[4] Notably, the Supreme Court has never adopted "a bright-line rule for determining the applicability of *Miranda* in prisons." *See Howes v. Fields*, 565 U.S. 499, 506 (2012) (citing *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

clean and collect the paperwork that Cavallero had tossed on the ground and to reorganize the rest of his property.  (*Id.* at 18.)  Cavallero also called Plaintiff a "Black Jew" and said that his hair was "dirty and nappy."  (*Id.*)  Finally, Adino authorized Cavallero's "unreasonable search" while Plaintiff was observing the Sabbath, even though she knew it was arbitrary and intended to harass Plaintiff.  (*Id.*)

The First Amendment to the United States Constitution guarantees the right to free exercise of religion.  U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). The free exercise clause applies to prison inmates, subject to appropriate limiting factors.  *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted); *see also Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

To state a claim under the First Amendment, a prisoner must establish that his sincerely held religious beliefs were substantially burdened by the challenged conduct. *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591).  "A substantial burden is more than a mere inconvenience" but "involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs."  *Gill v. Defrank*, No. 98-CV-7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), *aff'd*, 8 F. App'x 35 (2d Cir. 2001) (summary order) (citing *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)).

1.  Dixon

Dixon's failure to follow DOCCS Directive 4910, by itself, is insufficient to state a free exercise claim because "violations of DOCCS' directives are not actionable under a section 1983 claim." *Ciaprazi v. Jacobson*, No. 13 CIV. 4813 PAC KNF, 2014 WL 2751023, at *8 (S.D.N.Y. June 17, 2014), *report and recommendation adopted as modified*, No. 13 CIV. 4813 PAC KNF, 2014 WL 5050591 (S.D.N.Y. Sept. 23, 2014).

With respect to Plaintiff's allegation that Dixon violated his right to free exercise by throwing his torah on the ground, Plaintiff fails to state a claim because he does not allege how Dixon's conduct substantially burdened his religious practice.  *See Bradshaw v. Burns,* No. 919CV0931BKSDJS, 2020 WL 1129870, at *8 (N.D.N.Y. Mar. 9, 2020) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) ("To state a claim under the Free Exercise Clause of the First Amendment, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."))  This claim will be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

2.  Cavallero

Construing the Amended Complaint liberally, Plaintiff's allegations against Cavallero are sufficient to require service of this claim.

In *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004), the plaintiff was disciplined for failing to obey a corrections officer's order to return his tray and cup, an order plaintiff claimed was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged."  *Id*. at 204–05.  After a disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability

to break his Ramadan fast with the appropriate food. *Id.* at 199. The district court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

> When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast. In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not permit him to respond to the command before he had finished making salat. If these allegations are true, an unconstitutional burden may have been placed on McEachin's free exercise rights.

*Id.* at 201 (footnote omitted). The *McEachin* court emphasized the allegation that the corrections officer intentionally ordered plaintiff to perform a task, knowing that obeying the order would require plaintiff to violate his religious beliefs. *Id.* at 204. The court observed that "[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks that violate their religious beliefs." *Id.* at 205 (citing *Hayes v. Long*, 72 F.3d 70 (8th Cir. 1995) (inmate disciplined for refusing to handle pork while performing kitchen duties)). The *McEachin* court ultimately did not rule on this issue because it remanded the case to the district court for consideration of the First Amendment claims.

While not directly on point, *McEachin* suggests that Plaintiff's allegations that Cavallero conducted a vindictive and disruptive search of his cube, despite Plaintiff's explaining that he was in the midst of observing the Jewish Sabbath may state a free exercise claim. Cavallero's decision to conduct the search, which would require Plaintiff to "perform tasks that violate[d] [his] religious beliefs," *McEachin*, 357 F.3d at 205, may be interpreted as a form of punishment. This is particularly so if there was no legitimate penological reason for conducting the search, as Plaintiff's allegations suggest. *See Pugh v. Goord,* 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (internal citations and quotation marks omitted) ("To succeed on a claim under the Free Exercise Clause, the

prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.  The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational.")  This claim will be served on Cavallero.

### 3.  Adino

Plaintiff's allegations are insufficient to state a free exercise claim against Adino.  Even taking as true, Plaintiff's allegation that Adino authorized Cavallero's unreasonable search which she knew was arbitrary and intended to harass Plaintiff, Plaintiff does not allege that she was aware that it was the Jewish Sabbath, or even if she was aware, that he explained the significance of that fact and why a search would interfere with his religious practice.  This claim must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

### C.  Destruction of Property

The unauthorized intentional taking or destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim.  *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *see also Rivera–Powell v. N.Y.C. Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides [a] meaningful post deprivation remedy.").  "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action."  *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 F. App'x. 397,

400 (2d Cir. 2009) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property].").

Consequently, Plaintiff's claim for destruction of property will be dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D.  Access to the Courts

Plaintiff claims that Cavallero, Adino, Olles and Crowley denied him access to the courts. During a search of Plaintiff's living quarters, Cavallero seized a complaint that Plaintiff intended to file against Dixon and other legal documents, read all of Plaintiff's legal documents, and then threw them on the floor or it into the garbage.  Adino authorized Cavallero to conduct the search of Plaintiff's living quarters even though she knew that Cavallero was searching Plaintiff's living quarters to find his legal materials.  While conducting a disciplinary hearing, Olles took and failed to return to Plaintiff witness statements he intended to file as court exhibits.  Crowley failed to act after receiving notice that her employees were seizing and censoring Plaintiff's legal documents.

The Constitution requires a correctional facility to provide an inmate with meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  "Although "the taking of an inmate's papers will often interfere with an inmate's right of access to courts," the Court may not presume harm, and some showing of impaired access is required.  *Arce v. Walker*, 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999) (internal citations omitted).  In order to state a constitutional claim, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).  *Accord Morello v. James*, 810 F.2d 344, 347 (2d Cir. 1987).

Thus, a plaintiff must show that he has suffered an actual injury traceable to the challenged conduct of prison officials. A plaintiff has not shown actual injury unless he shows that a "nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison officials. *Lewis*, 518 U.S. at 351-52. Taking plaintiff's claim as true, he nevertheless offers no facts to explain how the Defendant's "conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995). Even if Defendants' conduct temporarily disrupted Plaintiff's ability to pursue one or more legal actions, he does not state a constitutional violation. *See Jermosen v. Coughlin*, No. 89 Civ. 1866 (RJW), 1995 WL 144155, at *4 (S.D.N.Y. Mar. 30, 1995) ("Interferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts do not violate this constitutional right."); *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995); *Herrera v. Scully*, 815 F. Supp. 713, 725 (S.D.N.Y. 1993) ("A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.").

Plaintiff's claim that he was denied access to the courts must be dismissed but with leave to file a Second Amended Complaint as instructed below.

### E.  Due Process Violations

Plaintiff alleges due process violations against Crowley, Olles, Dixon and Cavallero.

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a [liberty or] property interest is implicated, and if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation omitted). The threshold question for a due process claim "'is always whether the plaintiff has a property or liberty interest protected by the Constitution.'" *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) (quoting *Narumanchi v. Bd. of Trs. of the Conn. State Univ.*, 850 F.2d 70, 72

(2d Cir. 1988)).   For prison disciplinary proceedings where a liberty or property interest is implicated,

> an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

*Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (relying on *Wolff v. McDonnell*, 418 U.S. 539 (1974)). Convicted prisoners do not have a liberty interest in a disciplinary hearing unless the punishment subjects them to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "'[R]estrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual.'" *Washington v. Afify*, No. 15-4145, 2017 WL 730268, at *1 (2d Cir. Feb. 23, 2017) (summary order).

### 1.  Crowley

Plaintiff states that Crowley is allowing her staff to victimize him and make a sham out of due process.  (Dkt. No. 13 at 26.)  This claim will be dismissed with prejudice for failure to state a claim upon which relief may be granted.

### 2.  Olles

Plaintiff alleges that Olles, who conducted the disciplinary hearing in connection with Dixon's misbehavior report, could not be impartial because he and Dixon are co-workers, which would pre-dispose Olles to side with Dixon, was biased, prevented Plaintiff from calling all his

witnesses, completed the hearing disposition before the hearing was over, and falsified the written record of the hearing.

An inmate is entitled to have his disciplinary hearing conducted by an impartial hearing officer. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. at 570-71; *Russell v. Selsky*, 35  F.3d 55, 59 (2d Cir. 1994); *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990) ("an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen").  However, an impartial hearing officer need not come from outside the prison. *See Vitek v. Jones*, 445 U.S. 480, 496 (1980); *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).

"The degree of impartiality required of prison officials does not rise to the level of that required of judges generally.  It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259*.; see Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985) ("requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits").

At minimum, Olles' completion of the hearing disposition before the hearing was over and the falsification of the written record of the hearing suggests that he was not an impartial hearing officer.  Plaintiff's allegations are sufficient to serve this claim on Olles.

3. Dixon

Plaintiff alleges that Dixon's issuance of a false misbehavior report violated his due process rights and caused him to suffer thirty-days of SHU confinement.

As noted above, "[r]estrictive confinements of less than 10 days do not generally raise a liberty interest warranting due process protection, and to be actionable require proof of conditions

22

more onerous than usual." *Rivers v. Paige*, No. 12-CV-6593, 2014 WL 897094, at *2 (W.D.N.Y. Mar. 6, 2014) (citing *Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000)).  Nevertheless, viewing Plaintiff's allegations liberally, as the Court must, the allegation that Orleans does not usually punish a Tier II smoking ticket by time in keeplock, or SHU, (Dkt. No. at 31), may be sufficient to establish that Plaintiff's relatively brief stay in SHU was unusually onerous under the circumstances.

Plaintiff also alleges that Dixon falsified the misbehavior report, which was the subject of the disciplinary hearing at which his due process right were violated.  To maintain an actionable claim against corrections officers for filing a false misbehavior report, an inmate must be able to show either: (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right. *Willey v. Kirkpatrick*, 664 F. Supp. 2d 218, (W.D.N.Y. 2009), *vacated and remanded on other grounds* 801 F.3d 51 (2d Cir. 2015).  An inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimum procedural due process protections guaranteed by the Fourteenth Amendment. *Livingston v. Kelly*, 561 F. Supp. 2d 329, 331–32 (W.D.N.Y. 2008) (citing *Livingston v. Piskor*, 153 F. App'x. 769, 771 and n.1 (2d Cir. 2005) (adding that "a finding by the District Court that plaintiff was denied his due process rights may provide an independent basis for considering plaintiff's claims with respect to the filing of false misbehavior reports").

Plaintiff has sufficiently alleged that he was denied due process at the disciplinary hearing before Olles and there would have been no such hearing but for Dixon's false misbehavior report. These allegations are sufficient to require service of Plaintiff's due process claim against Dixon.

4.  Cavallero

In the Supplemental Complaint, Plaintiff alleges that Cavallero violated his due process rights by writing the November 4, 2019, false misbehavior report, which resulted in a disciplinary hearing at which Plaintiff was found not guilty.  Plaintiff does not suggest that his due process rights were violated at the disciplinary hearing itself.

The allegation that a misbehavior report was deliberately falsified does not state a constitutional violation on its own because an inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997*); Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).

This claim is insufficient for service on Cavallero and must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint.

### F.  Eighth Amendment

Plaintiff alleges an Eighth Amendment claim against Crowley, Olles, Adino, Dixon and Cavallero.  He states that the conditions of his confinement violated his right to be free from cruel and unusual punishment in various ways, as explained below.

It is well-established that the Eighth Amendment "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  To state a cognizable Eighth Amendment challenge to conditions of confinement, a plaintiff must plead both an objective element and a subjective element.  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). The objective element is met if the plaintiff alleges conditions that objectively posed an unreasonable risk of serious damage to his health so as to deny him "the minimal civilized measure of life's necessities." *Id*. (internal quotation marks omitted).  When considering these conditions, a court should "assess whether society

considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (emphasis in original). The subjective element requires a plaintiff to allege that the defendant acted with deliberate indifference with regard to the risks posed by the condition. *Walker*, 717 F.3d at 125. The defendant must have known of the condition that posed an excessive risk to inmate health and chosen to disregard it. *Id.* Analysis of the objective prong is "context specific," *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013) (internal quotation marks omitted), and "depends upon the claim at issue," *Hudson v. McMillian,* 503 U.S. 1, 8 (1992). Although not "every malevolent touch by a prison guard gives rise to a federal cause of action," the Eighth Amendment is offended by conduct that is "repugnant to the conscience of mankind." *Id.* at 9–10 (internal quotation marks omitted). Actions are repugnant to the conscience of mankind if they are "incompatible with evolving standards of decency" or involve "the unnecessary and wanton infliction of pain." *Id.* at 10 (quoting *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976)).

      1. <u>Harassment</u>

Plaintiff alleges that he was continuously harassed and verbally taunted by Dixon and Cavallero. However, "harassment or profanity alone, unaccompanied by any [physical] injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (citation and internal quotation marks omitted); *accord*, *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (finding that plaintiff's allegations that he was bumped, grabbed, elbowed, and pushed by a corrections officer and subjected to isolated episodes of verbal and physical harassment do not singly or cumulatively meet the objective or subjective components of the Eighth Amendment standard); *see also Islam v.*

*Fischer,* No. 07 CIV. 3225 (PKC), 2008 WL 2600054, at *3 (S.D.N.Y. June 25, 2008) (recognizing that plaintiff's allegation that a correctional officer "engaged in 'guerilla warfare against him'" based on threats and verbal insults did not state and Eighth Amendment violation because, "the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons . . . [Verbal insults] do not deprive prisoners of the minimal civilized measure of life's necessities, and thus do not constitute an Eighth Amendment violation." (citation omitted)). As such, this claim must be dismissed with prejudice.

However, Plaintiff's allegations that Dixon and Cavallero conducted frequent degrading searches and vandalized his cube, destroying his personal property and censoring and seizing his legal documents may state an Eighth Amendment claim.  "Prison cell searches are actionable under the Eighth Amendment only if they lack any legitimate penological interest and are intended solely to harass the inmate."  *Doyle v. Santiago*, No. 3:19-CV-901 (MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019) (citing *Davis v. Collado*, No. 16-CV07139(KMK), 2018 WL 4757966, at *13 (S.D.N.Y. Sept. 30, 2018) (citing *Jones v. Harris*, 665 F. Supp. 2d 384, 395 (S.D.N.Y. 2009)). Consequently, this claim will be served on Dixon and Cavallero.  Moreover, to the extent that Adino authorized the harassing searches conducted by Dixon and Cavallero, this claim must also be served on her.

2.  SHU Confinement

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."  *Hutto v. Finney,* 437 U.S. 678, 685 (1978). Although "[i]t is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual [,] . . . [i]t is equally plain [ ] that the length of confinement cannot be ignored in deciding whether the [overall

conditions of] confinement meet [ ] constitutional standards." *Hutto,* 437 U.S. at 686.  In other words, whether incarceration in the SHU violates the Eighth Amendment, like the liberty interest inquiry discussed above in connection with Plaintiff's due process claims, depends on the duration and conditions of the confinement.  *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

Generally speaking, confining an inmate in SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment.  *See Bowens v. Smith*, No. 9:11-CV-784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("'[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

Plaintiff's allegations that entering SHU was uncomfortable because he was strip searched, separated from his personal property and legal materials, restricted in his ability to shower or leave his cell without shackles, only able to attend family visit from behind plexiglass, and unable to call his family are insufficient to state Eighth Amendment violations.  However, his allegations that he was forced to care for his epileptic cellmate through numerous seizures, that he was double celled even though there was space available to single-cell all inmates in SHU, that when he was double-celled his cellmate had a medical condition that resulted in bodily fluids and blood spilling onto the floor and desk, and that his cell had a shared toilet that was clogged for days and resulted in urine and fecal matter pouring onto the floor may be sufficient to state Eighth Amendment violations.

"Double celling can amount to an Eighth Amendment violation if combined with other adverse conditions." *Boltonv. Goord*, 992 F. Supp. 604, 626 (citing *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996)); *see also Bell v. Artuz*, 98 Civ. 4710(MBM), 1999 WL 253607,*3 (S.D.N.Y. Apr. 29, 1999) () (citing *Bolton* ).  The question of what "other adverse conditions" are sufficient to demonstrate that double-celling violated an inmates Eighth Amendment rights, must be determined based on the totality of the circumstances.  *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.").

Where double-celling only subjects an inmate to discomfort and increased tension and fear, Courts are reluctant to find an Eighth Amendment violation.  *See, e.g., Waldo v. Goord*, 97 Civ. 1385(LEK), 1998  WL  713809,*2–3  (N.D.N.Y.  Oct.  1,  1998); *Bell*, 1999 WL 253607 at *4 (allegations of discomfort, together with poor ventilation in cell, lack of bacterial soap, pillows and lights for each prisoner does not "create a totality of circumstances where 'the minimal civilized measure of life's necessities' is being denied."). By contrast, Eighth Amendment claims have been sustained where overcrowding is severe and accompanied by real hardships.  *See e.g., Ingalls v. Florio*, 968 F. Supp. 193, 198 (D.N.J. 1997) (routine housing of five or six inmates in cells designed for only one or two persons; inmates slept on the floor for periods as long as eleven months, endured unsanitary living conditions and contaminated food, and went without outdoor recreation for time periods in excess of one year).

Moreover, "whether exposure to human waste is cruel and unusual depends on both the duration and the severity of the exposure." *Willey*, 801 F.3d at 68; *see Liverpool v. Davis*, No. 17

CIV. 3875 (KPF), 2020 WL 917294, at *11 (S.D.N.Y. Feb. 26, 2020) (finding that "exposure to human waste, even for periods of short duration, may constitute an objectively serious deprivation").

While Plaintiff's allegations may be sufficient to demonstrate that he was subjected to cruel and unusual punishment, he does not make clear which of the Defendants is responsible for the alleged conduct.  To be sure, Olles punished Plaintiff with thirty-days confinement in SHU, however, there are no allegations to suggest that he had anything to do with selecting the cell in which Plaintiff would serve his time or with whom he might be required to share a cell.  Plaintiff does not offer any facts to suggest how Crowley, Adino, Dixon and Cavallero were involved in his SHU placement. Consequently, this claim must be dismissed without prejudice to Plaintiff filing a Second Amended Complaint as instructed below.

### 3. Excessive Force

Plaintiff alleges that on November 3, 2019, without any provocation, Cavallero assaulted him in the laundry room and then called the emergency response team to cover up his conduct.

The Eighth Amendment prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262–63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

The key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per

curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained.").

The facts alleged in the Supplemental Complaint are sufficient for this claim to be served against Cavallero.

### G. Fourth Amendment

In the Supplement Complaint, Plaintiff alleges that he was "seized off his housing unit," (Dkt. No. 17 at 8), subject to an unconstitutional strip search and placed in SHU in violation of his Fourth Amendment rights.

Plaintiff was not seized within the meaning of the Fourth Amendment when he was moved from his regular housing unit to SHU after the disciplinary hearing in which he was found guilty. *United States v. Robertson*, 239 F. Supp. 3d 426, 441–42 (D. Conn. 2017) ("As its words make clear, the Fourth Amendment's protection applies only if there has been a 'search' or a 'seizure'." . . . "A 'seizure' of a person occurs for purposes of the Fourth Amendment if the police arrest a person or otherwise intentionally restrict a person's freedom of movement to the point that a reasonable person would not feel free to terminate the encounter with the police." (citations omitted)).

Strip searches can implicate the Fourth Amendment, but there is a "long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment." *Castro–Sanchez*, 2012 WL 4474154, at *3 (citing *Covino v. Patrissi*, 967 F.2d 73, 77–80 (2d Cir. 1992)). "[T]he Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable." *Jean–Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir.2012) (citation omitted). In order to challenge a strip search on this basis, "the plaintiff must allege facts suggesting that the

search did not serve a legitimate penological purpose, but was instead designed to intimidate, harass, or embarrass him."  Smith, 2015 WL 3929621, at *2.

Plaintiff's allegations do not suggest that the strip search he endured prior to being placed in SHU did not serve a legitimate penological purpose.  Moreover, he does not suggest that any of the Defendants conducted the seizure or the strip search.  This claim will be dismissed with prejudice.

### H.  Unconstitutional Usurpation

Plaintiff accuses Cavallero of acting illegally because he did not file an Oath of Office under New York Pub. Off. Law § 10.  There is no indication that the law allows for a private right of action against a public officer who fails to file an Oath of Office under § 10.  Moreover, violation of state law is insufficient to state a claim under § 1983.  Section 1983 only provides a cause of action for deprivations "of rights, privilege, or immunities secured by the Constitution or laws of the United States."  *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).  "It is axiomatic [than] that violations of state law alone are insufficient to state a claim for [section] 1983 relief."  *Powers v. Coe*, 728 F.2d 97, 105 (2d Cir. 1984)).  This claim will be dismissed with prejudice.

### I.  Leave to Amend

Should Madison seek to pursue one or more of the claims dismissed without prejudice by the Court herein, he must file a Second Amended Complaint.  Any Second Amended Complaint, which shall supersede and replace the Amended Complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which Madison has a legal right to pursue, and over which the Court may properly exercise jurisdiction.  Any Second Amended Complaint filed by Madison must also comply with the pleading requirements of Rules 8 and 10 of

the Federal Rules of Civil Procedure and will be subject to review by the Court pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A in the same manner as the Amended Complaint was reviewed herein.

## CONCLUSION

For the reasons set forth above, Madison may proceed on his retaliation, free exercise and Eighth Amendment excessive force claims against Cavallero, his due process and Eighth Amendment claims against Dixon, his due process claim against Olles, and his Eighth Amendment claim against Adino as described above.  His retaliation claims against Crowley and Dixon, his free exercise claim against Dixon and Adino, his access to the courts claim against Cavallero, Adino, Olles and Crowley, his due process claim against Cavallero, and his Eighth Amendment claim with respect to his SHU confinement against Crowley, Adino, Dixon and Cavallero will be dismissed under 28 U.S.C. § 1915(e)(2)(B) and 1915A(b) unless he files a Second Amended Complaint within **sixty days of the date of this order** which includes the necessary allegations as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

## ORDER

IT HEREBY IS ORDERED that Madison's motion to proceed *in forma pauperis* is granted; and it is further

ORDERED that Madison's motion for the appointment of counsel (Dkt. No. 12) is denied as premature; and it is further

ORDERED that Madison is granted leave to file a Second Amended Complaint as directed above no later than **sixty days after the date of this order;** and it is further

ORDERED that if Madison does not timely file a Second Amended Complaint as directed above, all claims that are insufficient for service, as described above, shall be dismissed with

prejudice without further order of the Court; and all claims deemed sufficient for service, as described above shall be served on the Defendants as explained below; and it is further

ORDERED that, if Madison does not timely file a Second Amended Complaint, the Clerk of Court is directed to cause the United States Marshal to serve copies of the Summons, Amended Complaint, Supplemental Complaint and this Order on Defendants Adino, Olles, Dixon and Cavallero without Madison's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Madison's favor; and it is further

ORDERED, that, if Madison does not timely file a Second Amended Complaint and the Amended Complaint and Supplemental Complaint are served as directed above, the Clerk of Court is directed to forward a copy of the Summons, Amended Complaint, Supplemental Complaint and this Order by email to Gary Levine, Acting Assistant Attorney General in Charge, Rochester Regional Office <Gary.Levine@ag.ny.gov>;

SO ORDERED.

FRANK P. GERACI, JR.
CHIEF UNITED STATES DISTRICT JUDGE

DATED:      May 18, 2020
            Rochester, NY